**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| CLN Properties, Inc., individually and on behalf of all those similarly situated, et al., ) ) ) | No. CV-09-1428-PHX-DGC |
| Plaintiffs, ) ) | **ORDER** |
| vs. ) ) | |
| Republic Services, Inc., et al., ) ) | |
| Defendants. ) ) | |

The ten named plaintiffs in this action, on behalf of themselves and a similarly situated class of customers, have filed a second amended complaint against Defendants Republic Services, Inc. and Allied Waste Industries, Inc.  Doc. 62.  Plaintiffs ask the Court to certify the class under Rule 23 of the Federal Rules of Civil Procedure.  Doc. 86.  The motion for class certification has been fully briefed, and the Court heard oral argument on December 3, 2010.  Because the Court concludes that individual issues would predominate over common issues if this case were tried as a class action, the Court will deny class certification.

**I.    Background.**

Defendants Republic Services, Inc. and Allied Waste Industries, Inc. merged into a single company in 2008 and are now collectively known as Republic Services, Inc.

1   (hereinafter "Defendant").  Doc. 62 at 2.[1]  Defendant is a publicly traded waste disposal
2   company that operates in 40 states and Puerto Rico.  Doc. 98 at 182-83.

3          The named Plaintiffs are ten companies and individuals located in nine different states
4   who entered into contracts with or otherwise arranged to receive waste disposal services from
5   Defendant or its subsidiaries.  Doc. 62 at 4-5.  Plaintiffs allege that Defendant began charging
6   two cost recovery fees in 2005, "one ostensibly to recover the company's rising fuel costs"
7   and the other "ostensibly to recover the company's rising environmental costs."  *Id.* at 2.
8   Plaintiffs contend that "(a) the fees have not been tethered to actual changes in the company's
9   fuel and environmental costs, but rather represent deceptively obtained price increases that
10  were intended to and that did go to defendant's profit line; (b) the fees have been inconsistent
11  with the expectations of the plaintiff contracting parties; (c) the fees have been
12  unconscionable as they did not fall within the reasonable expectations of the plaintiff
13  contracting parties, who were the weaker and adhering parties to the arrangements, as the
14  existing agreements contained penalty provisions for refusal to accept the terms and carry
15  on business with defendant; and (d) regardless, because the contract purports to give
16  defendants the unilateral authority to increase the fees at will and without additional
17  consideration to the plaintiff parties, the purported contract is illusory and without effect."
18  *Id.* at 3.

19         Plaintiffs' second amended complaint asserts claims for injunctive relief (Count I),
20  restitution (Count II), breach of contract (Count III), breach of the implied covenant of good
21  faith and fair dealing (Count IV), and unjust enrichment (not identified as a separate count).
22  *Id.* at 18-20.  The Court previously granted Defendant's motion to dismiss a claim for
23  deceptive practices.  *See CLN Props., Inc. v. Republic Servs., Inc.*, 688 F. Supp. 2d 892 (D.
24  Ariz. 2010).  Plaintiffs seek class certification only with respect to Counts III and IV and the
25  unjust enrichment claim.  Doc. 93-6.  Plaintiffs propose the following class definition:

26

27

28
          [1] Citations to the docket will be to page numbers attached by the docketing software
    at the top of each page, rather than to original page numbers at the bottom of the page.

1
2
3
4
5
6

> [P]ersons and entities in Arizona, Alabama, Arkansas, California, Colorado, Delaware, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nevada, New Hampshire, New Jersey, New York, North Carolina, Oklahoma, Ohio, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Utah, Virginia, Washington, West Virginia, and Wisconsin who, between February 1, 2005 through the present, paid fuel/environmental recovery fees to defendants pursuant to agreements with Allied Waste or an Allied Waste Affiliate, including but not limited to "service agreements," for waste removal services[.]

7

Doc. 119-1 at 31-32.[2]

8

**II.    Rule 23 Requirements.**

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Under Rule 23(a), a district court may certify a class only if (1) it is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims of the representative parties are typical of the claims of the class, and (4) the representatives will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a)(1)-(4). Under Rule 23(b), the court must also find that (1) the prosecution of separate actions would create a risk of rulings that are inconsistent or dispositive of the interests of non-parties, (2) the party opposing the class has acted on grounds generally applicable to the class thereby making declaratory relief appropriate, or (3) questions of law or fact common to class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for resolving the controversy. Fed. R. Civ. P. 23(b)(1)-(3). Plaintiffs seeking class certification bear the burden of showing that each of the four requirements of Rule 23(a) and at least one requirement of Rule 23(b) have been met. *Dukes v. Wal-Mart, Inc.*, 509 F.3d 1168, 1176 (9th Cir. 2007). The court must "rigorously analyze" the class to ensure that it comports with the requirements of Rule 23. *See Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982).

24

Plaintiffs seek to certify their proposed class under Rule 23(b)(3). Doc. 93-6 at 12. As

25
26
27
28

---

[2] Plaintiffs further clarify that the class does not include persons and entities affiliated with Defendant, Plaintiffs' counsel, or the Court. In their reply memorandum, Plaintiffs also exclude from the class "governmental entities" and "national accounts." Doc. 119-1 at 32 n.46.

1   noted above, such a class may be certified only if questions of law or fact common to class
2   members predominate over questions affecting only individual members.  Because the
3   proposed class clearly fails this requirement, the Court need not address the requirements of
4   Rule 23(a) or the superiority element of Rule 23(b)(3).

5   **III.   Common Questions Will Not Predominate in the Proposed Class.**

6          The Court will address each of the claims included in Plaintiffs' proposed class.

7          **A.     Breach of Contract.**

8          The second amended complaint alleges that the named Plaintiffs and class members
9   entered into express contracts with Defendant for waste removal services, and that
10  implementation of the fuel and environmental fees breached these contracts.  Doc. 62 at 19.
11  Plaintiffs ask the Court to certify the class with respect to this breach of contract claim.  For
12  a variety of reasons, individual issues would overwhelm any such class.

13                **1.     There is no uniform contract.**

14         Plaintiffs assert that class members contracted for waste disposal services through a
15  single, uniform contract that was implemented by Defendant in 2006.  Although it is true that
16  Defendant sought to implement a single customer service agreement in September of 2006
17  (Doc. 93-4), the facts presented by the parties make clear that members of the class held a
18  wide variety of contracts with Defendant, and some had no written contracts at all.  This fact
19  is best illustrated by considering the ten named plaintiffs.

20         Plaintiff Academy Street Villas, a California entity, entered into a contract with
21  Pacific Waste Services, a subsidiary of Defendant, in February of 2005.  The contract
22  provided that Pacific Waste Services would give 30 days' notice of any increase in charges,
23  but reserved the right to increase charges from time to time proportionately with the
24  increasing costs for fuel, regulatory compliance, and other matters.  Doc. 97-1 at 5, 24.

25         Plaintiff Julie Ellison did business as The Cat and The Fiddle Tavern in Illinois.  In
26  January of 2005, she entered into a contract with Midwest Waste, another subsidiary of
27  Defendant, which provided that "[b]ecause disposal and fuel costs constitute a significant
28  portion of the cost of Midwest Waste's services provided hereunder[,] Customer agrees that

Midwest Waste may increase the rates hereunder proportionately to adjust for any increase in such costs[.]" *Id*. at 6.  The contract further provided that Midwest Waste could increase other rates "with the consent of the Customer," and that "[s]uch consent may be evidenced verbally, in writing, or by the actions and practices of the parties." *Id*.  In November of 2007, Ms. Ellison entered into a new contract with Midwest Waste which provided that she would pay "a fuel/environmental recovery fee in the amount shown on each of Company's invoices, which amount Company may increase or decrease from time to time by showing the amount on the invoice." *Id*. at 6, 31.

Plaintiff CLN Properties, which operated in Georgia, entered into a contract with BFI Waste Services, a subsidiary of Defendant, on January 21, 2004.  The contract was similar to Ms. Ellison's first contract, but contained some variation in the language. *Id*. at 8, 36.  In July of 2005, CLN entered into the same contract, but with a handwritten note which read "Fuel Recovery Fee/Environmental Fee will be applied." *Id*. at 9, 41.

Plaintiff Country Club of Brewerton, located in Alabama, entered into a contract with BFI Waste Services of Georgia in November of 2004.  The contract included the same language as Ms. Ellison's first contract. *Id*. at 10, 47.  In August of 2008, the Country Club entered a contract with the same language as Ms. Ellison's second contract. *Id*. at 11, 49.

Plaintiff Gordy Development LLC of Alabama entered into a contract with Allied Waste Services, located in Kentucky, in August of 2007. *Id*. at 12, 56.  The contract was the same as Ms. Ellison's second contract.

Plaintiff Maevers Management Company of Missouri entered into a contract in 2003 with Midwest Waste which contained the same language as Ms. Ellison's first contract. *Id*. at 13.  In January of 2005, Maevers entered into a new contract that contained the same language as Ms. Ellison's second contract. *Id*. at 13, 60.  In June of 2005, Maevers entered into a contract that contained the language from its original agreement as well as a handwritten note stating "fuel plus environmental fee." *Id*, at 14, 61.  In November of 2008, Maevers entered into a contract which provided that it would pay "an amount, as determined by Company, with respect to the cost of fuel and oil products used in the operation of the

1    business of Company and its affiliates (the 'Fuel Fee'), and . . . an amount, as determined by

2    Company, of the service fees billed to customer for costs associated with environmental

3    compliance in the operation of the business of Company and its affiliates (the 'Environmental

4    Fee' and, collectively with the Fuel Fee, the 'Fuel/Environmental Fee') . . . .   Company

5    reserves the right to increase the fees and taxes, the Fuel Fee, and/or the Environmental Fee

6    at any time."  *Id*. at 15, 67.  The contract also included a handwritten notation which read

7    "Fuel/Enviro Fees apply."  *Id*. at 15, 66.

8          Plaintiff Mary Brooks Pittman of Florida had no written contract with Defendant or

9    one of its subsidiaries.  Defendant notes that residential customers were not required to enter

10   into written service agreements.  *Id*. at 17.  Ms. Pittman did, however, receive and pay

11   invoices that included the "Fuel/Environmental Recovery Fee" as a separate line item.  Doc.

12   98 at 2-3.

13         Plaintiff Buffen Automotive, Inc., doing business in Michigan as Top Value Auto and

14   Truck, entered into a contract in 2003 with Great Lakes Waste Services, another subsidiary

15   of Defendant.  The contract contained the same language as the first contract described above

16   for Ms. Ellison.  Doc. 97-1 at 18; Doc. 98 at 6.

17         Plaintiff Jackie Ullery of Indiana did not have a written contract for waste disposal

18   services.  She did, however, receive and pay invoices that included a "fuel/environmental

19   recovery fee" line item.  Doc. 97-1 at 19; Doc. 98 at 10-11.

20         Finally, Plaintiff Walnut Woods Condo Association of Ohio entered into a contract

21   with Allied Waste Services in 2006 which contained the same language as Ms. Ellison's

22   second contract.  Doc. 97-1 at 20; Doc. 98 at 14.  The contract was renewed in 2007.

23   Doc. 97-1 at 20; Doc. 98 at 16.  In March of 2008, after Walnut Woods complained about

24   the fees, the waste hauler's account representative modified the agreement by a letter which

25   read:  "What I am going to do is to roll back your base rate to the original $556.50.  There

26   will be a Fuel Recovery Fee of 12% added effective February 1, 2008."  Doc. 98 at 17.

27         As this description of the Plaintiffs' contracts demonstrates, the ten named Plaintiffs

28   entered into several different contracts, with different subsidiaries of Defendant, in different

states, at different times.  Some of the contract language at some of the times was identical, but often it was not.  Some of the contracts bore handwritten notations.  One of the contracts was modified by a letter.

Plaintiffs' proposed class spans 39 states and, by the parties' estimate, millions of customers of hundreds of Defendant's subsidiaries.  If significant and material variations can be found in the contracts of only the ten named Plaintiffs, innumerable individual issues will arise from contracts between millions of class members and hundreds of subsidiaries.

In addition, as Defendant demonstrated in a declaration submitted in response to the motion to certify, a limited review of some contract files identified more than 105 contracts with handwritten modifications related to the fuel and environmental fees.  Doc. 98 at 173, 176-179.[3]  These modifications sometimes simply note that fuel or environmental fees would be recovered, but others clearly modify the customer's fee obligation.  Some notations state that no fuel or environmental fees will be recovered for three years.  *Id*. at 176.  Some specify fixed rates for the fees.  *Id*.  Some say that the fees will be built into the overall waste hauling rate.  *Id*.  These notations make clear that some customers negotiated changes to their contracts that specifically modified the fee obligations at issue in this lawsuit.  Moreover, Defendant's internal policy as of November 2004 specifically stated that customers who objected to the fees would not be charged: "If the customer ultimately objects to this fee and you are unable to negotiate the customer's consent, the Fuel Recovery Fee cannot be charged to that customer."  Doc. 92-7 at 1.

In their reply memorandum, Plaintiffs attempt to grapple with the wide variety of contracts by suggesting that they can be divided into 12 subgroups.  Doc. 119-1 at 12.  But in addition to the fact that a breach of contract class with 12 different subgroups would likely prove unmanageable, Plaintiffs fail to account for the various handwritten notations made

---

[3] This information is contained in the declaration of Scott Russeth.  Doc. 98 at 163. Plaintiffs have filed a motion to strike Mr. Russeth's declaration, arguing that it contradicts his deposition testimony and therefore amounts to a sham affidavit.  Doc. 118.  The information on these contract notations, however, is contained in a portion of the Russeth declaration that is not challenged in Plaintiff's motion.  *Id*.

1   to many of the contracts.  Nor do Plaintiffs' proposed subgroups account for the fact that
2   many customers changed their form of contract at different times.  Thus, a single class
3   member might be a part of several different subgroups for time periods different from other
4   class members.  The subgroup proposal also fails to account for contracts that were modified
5   by other written documents, such as the letter to Plaintiff Walnut Woods.

6       In summary, there was no uniform contract.  Rather, there appear to have been many
7   different forms of contract used in different locations during different time periods.
8   Customers often had more than one form of contract during the life of their relationship with
9   Defendant's subsidiaries, contracts often contained handwritten notations varying key terms
10  of the agreement, and in some cases the contracts were modified by separate documents such
11  as a written letter.  Given this significant variation in contract terms, individual issues clearly
12  would predominate if the breach of contract claim were to be tried on a class-wide basis.  An
13  examination of each customer's contract would be required to identify the relevant provision
14  that allegedly was breached.

15              **2.      Communications Were Not Uniform.**

16      Plaintiffs' primary argument in support of class certification focuses on a 2005 notice
17  that Defendant provided to customers regarding implementation of the fuel fee.  The notice
18  did not address the environmental fee.  *See* Doc. 91-8.

19      The notice explained that the costs involved in providing solid waste management
20  services had increased and that fuel prices were very unstable.  Defendant explained: "[w]e
21  have now reached the point where we can no longer absorb these costs.  [W]e have chosen
22  to implement a Fuel Recovery Fee which separates the fuel component of our overall rate
23  into a separate line item on our invoice; unfortunately, this will result in an overall price
24  increase.  However, the Fuel Recovery Fee will be guided by fluctuations in our cost of fuel.
25  Hopefully we will see fuel prices return in time to more modest levels and a corresponding
26  decrease in the Fuel Recovery Fee."  *Id*.  The notice was enclosed with invoices sent to
27  customers in February of 2005.

28      Plaintiffs contend that the notice and subsequent website statements that explained the

1    fuel fee misleadingly suggested that customers would be charged only for incremental

2    increases in fuel costs, not for all of Defendant's fuel costs as in fact occurred.  Doc. 93-6 at

3    18-20.  Plaintiffs claim that the misleading notice breached the contracts of Defendant's

4    customers and that the breach can be litigated on a class-wide basis because the focus will

5    be on the notice created by Defendant at corporate headquarters and uniformly sent to all

6    customers.  *Id*. at 21-22.[4]

7        Even assuming that a breach of contract claim could be based on a false statement

8    made after the contract was formed – a proposition Plaintiffs have not established in the laws

9    of the 39 states at issue – the Court concludes that there was no uniform communication that

10    would facilitate class-wide treatment of such a claim.  The fuel fee notice was sent only in

11    February of 2005, but the proposed class covers customers from 2005 to the present.  Class

12    members in the same position as Plaintiffs Gordy Development and Walnut Woods – who

13    entered into contracts with Defendant's subsidiaries after February of 2005 – would not have

14    received the alleged class-wide statement.

15        Moreover, it is not at all clear that most 2005 customers received the notice.  Five

16    named Plaintiffs were deposed by Defendant in preparation for the class certification

17    briefing, and none recalled seeing the notice.  Plaintiffs contend that the misleading

18    statements in the notice were compounded by false statements and omissions on Defendant's

19    website, but only one of the Plaintiffs saw a document from the website.  Doc. 97 at 15-16.

20        Rather, it is clear from the depositions of named Plaintiffs and the various documents

21    submitted in connection with the motion that most customers communicated with sales

22    representatives of Defendant's subsidiaries.  Although Defendant provided "talking points"

23    for these sales representatives (Doc. 92-7), a breach of contract claim premised on false

24    _____

25        [4] Plaintiffs' briefing on class certification treats this case more as a fraud claim than

26    a breach of contract claim.  Plaintiffs focus primarily on communications from Defendant's
     headquarters to customers of Defendant's subsidiaries, claiming that the communications

27    were uniform and misleading.  *See, e.g.,* Doc. 96-6 at 27; Doc. 119-1 at 15.  Plaintiffs,
     however, do not assert a fraud claim.  *See* Doc. 62.  If class certification is to occur, it must

28    be based on the claims asserted in the second amended complaint.

1    statements made to customers would require a customer-by-customer inquiry into what
2    statements actually were made by sales representatives, whether the statements were
3    misleading, and what else the customer knew about the fuel fees.  As noted above, some
4    customers negotiated modifications to their contracts that either eliminated the fuel fees or
5    established a fixed rate for the fees.  Such customers presumably were not harmed by how
6    the fees were calculated or how they fluctuated.

7          In addition, the 2005 notice did not address the environmental fee.  Plaintiffs contend
8    that Defendant added the environmental fee to customer invoices in 2005 without any
9    explanation.  Doc. 93-6 at 20-21.  If this lack of explanation is the basis for Plaintiffs' claim
10   that the environmental fee breached the waste-hauling contracts, Plaintiffs must show that
11   class members in fact received no disclosures concerning the environmental fee.  This of
12   course would require inquiry into disclosures that may have been made by the sales
13   representatives with whom individual customers communicated.  In 2005, Defendant did
14   create a one-page set of "talking points" for sales representatives to use in discussing the
15   environmental fee.  Doc. 92-8.  To the extent Plaintiffs claim that these talking points led to
16   uniform representations concerning the environmental fee (Doc. 93-6 at 22), an inquiry into
17   what sales representatives actually said to customers would be necessary.

18         In summary, Plaintiffs cannot avoid the predominance of individual issues by relying
19   on a uniform set of communications delivered to all class members.  There was no uniform
20   set of communications.  Most class members communicated with local sales representatives.
21   Thus, even if allegedly misleading communications could be deemed to breach the waste-
22   hauling contracts, an examination of communications with each customer would be necessary
23   in order to adjudicate such a claim.

24              **3.    Plaintiffs Have Not Shown That State Laws Are Uniform.**

25         As already noted, Plaintiffs' proposed class could encompass waste disposal
26   customers in 39 different states.  Plaintiffs argue that the contract laws of these 39 states are
27   uniform.  Doc. 93-6.  Plaintiffs quote the following excerpt from the Court's previous order:
28              Under Missouri law, in order to state a claim for breach of contract, "a plaintiff

must allege (1) the existence of a contract or agreement and the terms of that agreement; (2) that plaintiff performed or tendered performance; (3) that defendant did not perform; and (4) that defendant's failure to perform caused plaintiff damage. V*enable v. Hickerson, Phelps, Kirtley & Assoc., Inc.*, 903 S.W.2d 659, 664 (Mo. Ct. App. 1995).  Under Georgia law, the elements for a breach of contract claim are "the (1) breach and the (2) resultant damages (3) to the party who has the right to complain about the contract being broken." *Kuritzky v. Emory Univ.,* 669 S.E.2d 179, 181 (Ga. Ct. App. 2008).

Doc. 93-6.  Plaintiffs claim that the common law of the 37 other states at issue in this case are akin either to Missouri or Georgia law.  In support, Plaintiffs provide lengthy string citations, with one case cited for each state.  Doc. 93-6 at 28 nn. 13, 14.

This presentation by Plaintiffs does not demonstrate that the contract law of all 39 states is the same in all respects relevant to this case.  For example, Plaintiffs' citation of law does not address the contract formation principles adopted in the various states.  Contract formation will be important in this case because the first step in proving a breach of contract claim is proving the terms of the contract.  As is evident from the discussion above, some class members have contracts that were modified by handwritten notations or separate letters. Class members also had oral communications with Defendants' sales representatives, as confirmed by depositions of the named Plaintiffs.  Whether such oral communications are part of the contracts and whether they can be used to explain handwritten notations on the contracts present questions of state law that may vary from jurisdiction to jurisdiction.  These issues are not addressed by Plaintiffs.

Plaintiffs assert in their reply memorandum that subclasses can be employed to manage variations in state law, but Plaintiffs propose no subclasses.  Doc. 119-1 at 18. Plaintiffs do not address whether there would be two or 20 subclasses, nor do Plaintiffs address whether there would be different subclasses based on different principles of law, with individual states being members of more than one subclass because of their particular mix of contract law.

Plaintiffs' reply acknowledges that state laws differ on the admissibility of extrinsic evidence to identify or interpret ambiguities in a contract.  Doc. 119-1 at 20.  Plaintiffs rely on two state decisions and two treatises to suggest that state laws on this subject can be

1   broken into two general groups – those that allow extrinsic evidence and those that do not

2   – and argue that subclasses can be created to accommodate these differences in state law.

3   But Plaintiffs do not evaluate the extrinsic evidence laws of the 39 states at issue in this case,

4   do not attempt to apply them to the contract formation facts revealed in the depositions of the

5   named Plaintiffs, and do not otherwise explain how such subclasses would be workable.

6         Moreover, Plaintiffs entirely overlook the problems that would arise from states that

7   allow the admission of extrinsic evidence to identify ambiguities in or to interpret contracts.

8   Inquiry into the extrinsic evidence surrounding each individual contract would be necessary

9   in such states.  That exercise alone would result in individual issues predominating over

10  common issues.

11        In summary, Plaintiffs have not met their burden of showing that individual issues will

12  not predominate as a result of the laws of the 39 states at issue in this case.  To the contrary,

13  it appears that state-by-state evaluation would be necessary, defeating any prospect that

14  common issues would predominate.

15              **4.     Plaintiffs' Contracts Were With Defendant's Subsidiaries.**

16        For the overwhelming majority of class members, contracts for waste hauling services

17  were signed with smaller local companies that are subsidiaries of Defendant, not with

18  Defendant.  Defendant has approximately 375 collection and hauling divisions that operate

19  under hundreds of subsidiaries in 40 states and Puerto Rico, with thousands of sales,

20  customer service, and other employees who interact with customers.  Doc. 98 at 182-83.

21  Plaintiffs have not sued the subsidiaries in this action, nor could they and comply with the

22  predominance and manageability requirements of Rule 23.

23        The result is that Defendant is not a party to most of the contacts with class members.

24  It did not sign the contracts, nor did it provide the services or collect the fees called for in the

25  contracts.  If Defendant is to be held liable for breach of the contracts with the class

26  members, therefore, the corporate veil of the subsidiaries must be pierced.  Piercing of a

27  corporate veil typically requires a fact-specific inquiry into the conduct of the particular

28  subsidiary and the parent.  Specific factors such as a failure to observe corporate formalities,

comingling of corporate assets and management, and the perpetuation of a fraud on those who rely on the subsidiary's corporate form typically are required. *See, e.g., Deutsche Credit Corp. v. Case Power & Equip. Co.*, 876 P.2d 1190, 1195 (Ariz. Ct. App. 1994). Piercing the corporate veil of hundreds of corporate subsidiaries would require hundreds of separate inquiries into these factors. In addition, because piercing the corporate veil typically is a matter of state law, the laws of 39 different states would be relevant on this question. Plaintiffs do not attempt to suggest that the laws of all these states are uniform. Moreover, some subsidiaries may have operated in more than one state, requiring a choice of law with respect to such subsidiaries.

In response to this issue, Plaintiffs argue that liability attaches to a parent for the wrongs of a subsidiary where the parent is a direct participant in the wrongdoing. Doc. 119-1 at 14. In support, Plaintiffs cite *United States v. Bestfoods,* 524 U.S. 51, 64-65 (1998), a CERCLA case that addressed owner and operator liability under the Superfund statute. *Bestfoods* recognized that a parent corporation may incur operator liability under the statute if it directly participates in the operation of a subsidiary's polluting facility. The case against Defendant, however, is not brought under CERCLA. There is no statutory operator liability here. And Plaintiffs have cited no law for the proposition that a parent corporation can be liable for its subsidiary's breach of contract absent piercing of the corporate veil.

The Court does not doubt that a parent could be liable for its own wrongdoing in appropriate cases. For example, if a parent induces a subsidiary to breach a contract, the parent may be liable for tortious interference with the contract. If a parent misleads customers of a subsidiary, the parent may be liable for fraud. But Plaintiffs have not asserted claims for tortious interference or fraud. Plaintiffs sue for breach of contract, and the contracts in question are with subsidiaries of Defendant, not with Defendant. Liability for the alleged breaches can be passed to the parent only if the corporate form of the subsidiary is disregarded. A subsidiary-by-subsidiary inquiry would be required to determine whether breaches of the subsidiaries' contracts may be attributed to Defendant.

1

### 5.    The Defenses of Consent and Voluntary Payment.

2      As noted above in the description of the named Plaintiffs' contract, several versions

3  of the contracts provide that fees may be increased with the consent of the customer and that

4  such consent "may be evidenced verbally, in writing, or by actions and practices of the

5  parties." *See, e.g.,* Doc. 97-1 at 6, 8, 10; Doc. 119-1 at 14.  Because a fee increase made

6  pursuant to a customer's informed consent would not constitute a breach of these contracts,

7  litigation of the breach claim would require a factual inquiry into whether or not the customer

8  consented.  Such an inquiry would require examination of the information provided to the

9  customer, questions asked by the customer, consent provided orally or in writing, and even

10  consent manifested by "the actions and practices of the parties."  Doc. 97-1 at 6.

11      In addition, some states recognize a defense known as the voluntary payment doctrine.

12  This doctrine provides that payments made with a full knowledge of the facts, and where no

13  misleading practice has been employed, are deemed voluntary and cannot later be recovered

14  from the party to whom they were paid.  *CLN Props.*, 688 F. Supp. 2d at 899 (citing Georgia

15  and Missouri law).  Defendants contend that the fuel and environmental fees were shown as

16  separate line items on each invoice, class members voluntarily made the payments, and class

17  members therefore cannot recover the payments.  In response, Plaintiffs assert that some

18  states do not recognize the doctrine at all, and those that do refuse to apply it when the

19  paying party has been given inaccurate information.  Doc. 93-6 at 31.  Plaintiffs argue that

20  this defense can be resolved on a class-wide basis because Defendant misled members of the

21  class.  *Id.*

22      As noted above, however, there was no single, uniform communication delivered to

23  all members of the class.  Although the February 2005 fuel fee notice was delivered to then-

24  existing customers, depositions of the named Plaintiffs show that many such customers never

25  read it.  In addition, many members signed contracts after this communication occurred.

26  Furthermore, the February 2005 notice applied only to the fuel fee; there was no class-wide

27  notice for the environmental fee.  Most customers received their information through local

28  sales representatives.  Thus, whether customers were misled and therefore are not subject to

1  the voluntary payment doctrine would require an individualized inquiry concerning
2  information the customer received about the fees.

3  **6.    Breach of Contract Summary.**

4  Plaintiffs' breach of contract claim cannot be litigated on a class-wide basis.
5  Individual issues would arise from the wide variety of contracts and modifications to
6  contracts with class members, the wide variety of communications upon which class
7  members may have relied, the laws of 39 different states, the fact-specific inquiries that
8  would be required before Defendant could be held liable for its subsidiaries' breach of
9  contract, and individualized defenses such as consent and the voluntary payment doctrine.
10 Because Plaintiffs' breach of contract claim would require the separate adjudication of each
11 class member's individual claim or defense, the class cannot be certified under Rule 23(b)(3).
12 *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir. 2001).

13 **B.    Breach of the Covenant of Good Faith and Fair Dealing.**

14 Plaintiffs allege that Defendant's imposition of the fuel and environmental fees, and
15 its misleading statements in connection with those fees, breached the covenant of good faith
16 and fair dealing implied in every contract.  Recognizing that this claim typically is a matter
17 of state law, Plaintiffs assert that "the states at issue view the good faith obligation through
18 similar prisms."  Doc. 93-6 at 33.  Plaintiffs then provide a string citation to cases from the
19 various states at issue in this case, with no individualized consideration of the law of each
20 state.  *Id.* at 33-34 n.19.

21 Defendant asserts that the laws of the various states differ on the existence and
22 application of the duty of good faith and fair dealing.  Defendant cites cases which have
23 denied class certification because of these differences.  *See Woodard v. Fidelity Nat'l Title*
24 *Ins. Co.,* No. CIV 06-1170 RB/WDS, 2008 WL 5737364 at *7 (D.N.M., Dec. 8, 2008)
25 (denying certification of class asserting breach of the covenant of good faith and fair dealing
26 because the "legal scope and requirements" for such a claim "differ markedly among the five
27 states" whose law is applied).  In reply, Plaintiffs assert that Defendants have not shown that
28 class members' claims would fail under the laws of particular states.  Doc. 119-1 at 24.  But

1    the burden of proof in this motion rests on Plaintiffs, not Defendant.  Plaintiffs' string citation

2    of one case from each state does not establish that the laws of these states are sufficiently

3    uniform to ensure that individual issues would not arise on this claim.

4         Moreover, individual issues will predominate on this claim for all of the reasons

5    described above with respect to the breach of contract claim.  Plaintiffs are suing for breach

6    of the covenant of good faith and fair dealing implied by law in the class members' contracts.

7    As its name suggests, the covenant protects the rights and expectations of the parties to the

8    contract.  In order to understand the covenant, one must understand the contract.  And as

9    discussed above, there is a wide variety of contracts among class members.

10        Specific differences among contracts clearly would be relevant to this claim.  For

11   example, the contract of Plaintiff Academy Street Villas specifically provided that

12   Defendant's subsidiary reserved the right to increase fees under the contract "proportionately

13   in connection with the increases in costs for . . . fuel [and] regulatory compliance."

14   Doc. 97-1 at 5.  Plaintiff Julie Ellison's contract also reserved the right to increase prices, and

15   additionally stated that increases could be made with the customer's consent, which "may

16   be evidenced verbally, in writing, or by the actions and practices of the parties."  *Id*. at 6.

17   Plaintiff Country Club of Brewton's second contract provided that the fuel and

18   environmental fee could be increased or decreased "from time to time" merely by showing

19   the amount on the invoice.  *Id*. at 11.  Plaintiff Mary Pittman had no written contract at all,

20   but paid invoices that specifically showed the fuel and environmental fees.  *Id*. at 17.

21   Plaintiff Walnut Woods Condo Association received a written modification to its contract

22   which appears to have rolled back its base rate in exchange for imposing the fuel recovery

23   fee, and then established a fixed fee of 12%.  Doc. 97-1 at 21.

24        These different terms would affect any claim for breach of the implied covenant of

25   good faith and fair dealing based on Defendant's having implemented the fees.  Contracts

26   that waived the fees obviously would give rise to no claim because the customers never paid

27   the fees.  Contracts that established a negotiated fixed fee may not be subject to such a breach

28   because the customers would not have paid for increases in fees.  Contracts that accorded

1   Defendant discretion to raise fees from time to time may not give rise to breach of the

2   covenant when fees were raised.   Customers with no contract would have no implied

3   covenant.  In short, a contract-by-contract inquiry would be necessary to resolve the breach

4   of covenant claim.

5          State laws would also affect the claim.  Some states provide that "a party does not

6   breach its obligation of good faith where it exercises a right that it has under the contract."

7   *Tommy McBride Realty, Inc. v. Nicholson*, 648 S.E.2d 468, 470 (Ga. Ct. App. 2007); *see also*

8   *Al-Khaldiya Elecs. & Elec. Equip. Co. v. Boeing Co.*, 571 F.3d 754, 758-59 (8th Cir. 2009)

9   (There "is no breach of the implied covenant of good faith and fair dealing where the contract

10  expressly permits the actions being challenged.") (citation omitted).  In contracts where

11  Defendant's subsidiary had the express right to increase fees (*see, e.g.,* Doc. 97-1 at 6, 31),

12  these states presumably would hold that increasing the fees does not constitute a breach of

13  the covenant.

14         Plaintiffs argue that an individualized inquiry would not be required because "all

15  plaintiffs and potential class members were entitled to reasonably expect that defendants

16  would truthfully disclose the nature of those fees at the time of contracting, when

17  implementing them and when obtaining consent from Plaintiffs to pay them."  Doc. 119-1

18  at 25.  Even if this is true, there was no uniform course of communications with all class

19  members.   Many class members communicated with individual sales representatives.

20  Whether those representatives made false or misleading statements in connection with fee

21  increases would require an individualized inquiry.

22         **C.     Unjust Enrichment.**

23         Plaintiffs do not attempt to show that the unjust enrichment law in the 39 states is

24  uniform.  Instead, they argue that courts have concluded that differences between state laws

25  pose little barrier to certification of an unjust enrichment class.  Doc. 119-1 at 27.  But

26  Plaintiffs bear the burden of showing that individual issues will not predominate.  It is their

27  obligation to show that the unjust enrichment claims asserted *in this case* could be litigated

28  on a class-wide basis.  They cannot do so simply by citing other cases that have certified

1   other unjust enrichment classes.

2         To establish their claim for unjust enrichment, Plaintiffs must show that they enriched

3   the Defendant.  *See, e.g., Mouse v. Saba*, 218 P.3d 1038, 1045 (Ariz. Ct. App. 2009) ("To

4   recover on a claim for unjust enrichment, a claimant must show (1) an enrichment, (2) an

5   impoverishment, (3) a connection between the two, (4) the absence of justification for the

6   enrichment and impoverishment and (5) the absence of any remedy at law.").  In this case,

7   however, class members likely paid their fees to subsidiaries of Defendants, not to

8   Defendant.  If Plaintiffs are to show that Defendant was enriched by payments made to its

9   subsidiaries, Plaintiffs will need to present evidence that a particular class member's fees

10  were in fact passed to Defendant by the subsidiary.  This will require an inquiry into the fee

11  handling practices of hundreds of subsidiaries for millions of customers.  Plaintiffs have

12  presented no evidence to show that this issue could be litigated on common facts.

13        In addition, Plaintiffs' proposed unjust enrichment class cannot presently be defined.

14  In their reply memorandum, Plaintiffs state that they "have asserted this claim as an

15  alternative form of relief on behalf of residential customers in the event the Court determines

16  that the relationship with [Defendant's] affiliates was something other than contractual."

17  Doc. 119-1 at 28.  Thus, members of the unjust enrichment class will be identified only

18  through a customer-by-customer determination of whether a contractual relationship existed

19  between the customer and Defendant's subsidiary.  Identifying the members of the class

20  would itself require an inquiry into the circumstances of each residential customer's

21  relationship with a subsidiary of Defendant.

22        In summary, Plaintiffs have not shown that the unjust enrichment laws of 39 states are

23  uniform, establishment of the claim would require a subsidiary-by-subsidiary and customer-

24  by-customer inquiry into whether fees were passed through to Defendant, and the class itself

25  could not be identified without an individualized examination of each customer's contractual

26  relationship with a subsidiary of Defendant.  Individual issues would predominate in any

27  attempt to litigate the unjust enrichment claim on a class-wide basis.

28

**IV.     Conclusion.**

        "[W]hen considering class certification under Rule 23, district courts are not only at liberty to, but must, perform a rigorous analysis to ensure that the prerequisites of Rule 23 have been satisfied[.]" *Dukes*, 603 F.3d at 594.  Predominance is no idle inquiry, for it "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).  This Court's analysis of the claims asserted by Plaintiffs shows that common issues will not predominate for the breach of contract, breach of covenant, and unjust enrichment claims.  Individual issues will predominate.  As a result, Plaintiffs' proposed class is not sufficiently cohesive to warrant adjudication by representation.

        **IT IS ORDERED:**

        1.      Plaintiffs' motion for class certification (Doc. 86) is **denied**.

        2.      Plaintiffs' motion to strike the declaration of Scott Russeth (Doc. 107) is **denied** as moot.  The Court did not consider any portion of the Russeth declaration that was challenged by Plaintiffs.

        3.      The Clerk is directed to file the document lodged as Doc. 118 under seal.

        4.      On or before **December 30, 2010**, Plaintiffs shall file a brief memorandum advising the Court of how they would like to proceed with this case in light of the Court's denial of class certification.

        DATED this 9th day of December, 2010.

                                                David G. Campbell
                                                United States District Judge